780 So.2d 1175 (2001)
Wilburn Morris FLENIKEN, II
v.
ENTERGY CORPORATION; TMI Enterprises, Inc.; Safeway Transportation, Inc.; and Zurich American Insurance of Illinois
TMI Enterprises, Inc.
v.
Zurich Insurance Company;[1] Safeway Transportation, Inc.; Entergy Corporation; and Wilburn Morris Fleniken, II
Nos. 2000 CA 1824, 2000 CA 1825.
Court of Appeal of Louisiana, First Circuit.
February 16, 2001.
Rehearing Denied April 2, 2001.
*1179 Stacey Moak, Baton Rouge, Counsel for Plaintiff/2nd Appellant Wilburn Morris Fleniken, II.
Arthur H. Andrews, Baton Rouge, Albin A. Provosty, Alexandria Dan E. West, Margaret Diamond, Baton Rouge, Counsel for Defendants/1st Appellants TMI Enterprises, Inc. and Clarendon National Insurance Company.
John A. Braymer, Baton Rouge, Counsel for Defendant Entergy Gulf States, Inc.
Thomas L. Gaudry, Jr., Thomas W. Darling, Gretna, Counsel for Appellant/Appellee Safeway Transportation, Inc.
Thomas M. Young, New Orleans, Counsel for Defendant/Appellee Zurich Insurance Company.
John J. Rabalais, Covington, Counsel for Intervenors Safeway Transportation, Inc. and Louisiana Commerce and Trade Association Self Insurers' Fund.
Before: CARTER, C.J., FOIL, and WEIMER, JJ.
WEIMER, J.
These consolidated appeals are from a judgment rendered pursuant to a jury verdict after trial on the merits in this personal injury case. On February 27, 1996, Wilburn Morris "Cheyenne" Fleniken, II *1180 was injured when he came in contact with an electrical distribution line owned and maintained by Entergy Gulf States, Inc. (Entergy) and located above the property of TMI Enterprises, Inc. (TMI). Mr. Fleniken filed suit[2] against Entergy; TMI; Safeway Transportation, Inc. (Safeway), lessee of the trailer upon which he was standing at the time of the accident; and Zurich American Insurance of Illinois (Zurich), the company that issued general liability and automobile liability insurance policies to Safeway.
Prior to the trial on the merits, Mr. Fleniken settled with Entergy.[3] The jury found TMI and Safeway to be equally at fault for the accident; found neither Entergy nor Mr. Fleniken at fault; and answered various interrogatories related to Safeway's claim to tort immunity based on its relationship with Mr. Fleniken. On November 15, 1999, the trial court rendered judgment in favor of Mr. Fleniken and against TMI and its insurer, Clarendon National Insurance Company (Clarendon), awarding $1,000,000 in damages; and against TMI awarding $40,391.37 in damages. The total amount of $1,040,391.37 represented one-half of the damages specified in the jury's verdict. The trial court also rendered judgment in favor of Safeway and Zurich dismissing Mr. Fleniken's claims against them and the cross-claims of TMI against them.[4]
From the November 15, 1999 judgment TMI, Clarendon, Mr. Fleniken, and Safeway appealed. Safeway also answered the appeals of Mr. Fleniken and TMI. Intervenor Louisiana Commerce and Trade Association Self Insurers Fund neither appealed nor answered the appeal.[5]
On appeal, TMI assigns three errors[6] relating to the merits:
1. The district court erred in entering judgment exonerating Entergy from all fault in connection with plaintiffs accident....
2. The district court erred in instructing the jury on strict liability and in finding TMI strictly liable and/or negligent and in assessing TMI with 50 percent fault for plaintiffs accident ....
. . . .
4. In the alternative, the district court erred in entering judgment on a legally erroneous and conflicting jury verdict, thereby holding Safeway immune from liability to plaintiff in tort and in not allocating more than 50 percent fault to Safeway.
On appeal, Mr. Fleniken assigns the following errors:
1. The trial court erred as a matter of law by allowing Jury Interrogatory # 3 [related to the two-contract theory] to be presented to the jury.
2. The trial court erred as a matter of law in its instructions to the jury regarding the issue of the two contract theory. It also erred when it omitted the plaintiffs requested jury instruction on Safeway's burden of proof on statutory employment.

*1181 3. The trial court erred as a matter of law by holding that Safeway was an immune tortfeasor; it erred further when it refused to hold TMI liable for Safeway's 50% fault once it found Safeway to be immune under the two contract theory.
4. The trial court erred as a matter of law by holding that the issue of Safeway's waiver of tort immunity could not be presented to the jury.
5. The trial court erred as a matter of law when it ruled that evidence about TMI's lease to Safeway was not to be heard by the jury, thus, the issue of strict liability on the part of Safeway could not go to the jury.
6. The trial court erred as a matter of law by instructing the jury that the answer to an interrogatory filed in pretrial discovery is a "judicial admission" which must be taken as fact.
7. The trial court erred as a matter of law by allowing Greg Stewart to give opinion testimony about the income of independent truckers who leased their trucks to his company, Safeway, without any basis in fact or proof of his qualifications as an expert.
8. The jury erred in its award of damages to the plaintiff for past, present and future pain and suffering, past, present and future mental anguish, future loss of income, and loss of earning capacity.
On appeal, Safeway urges the jury erred in the following findings: 1) that Mr. Fleniken was not performing manual labor for Safeway at the time of the accident; 2) that Entergy was not negligent and therefore not a cause of the accident; 3) that Safeway was negligent and the negligence was the proximate cause of damages suffered by plaintiff; and 4) that Mr. Fleniken was entitled to special and general damages which exceeded amounts a reasonable jury could award.

BACKGROUND
The accident that gave rise to this litigation occurred before daylight on the morning of February 27, 1996. Mr. Fleniken, an owner-operator of a small fleet of tractors,[7] had been contacted by a Safeway dispatcher to report the next day to the Safeway yard at TMI's trucking terminal off U.S. Highway 190 in Port Allen, Louisiana. Mr. Fleniken had a truck-and-driver lease agreement with Safeway, a motor carrier company that solicited business from companies in need of transportation of goods and products. Mr. Fleniken's assignment for that morning was to pick up bulk tank trailer No. B11125, which was leased by Safeway and located at the TMI terminal, and then to pick up a load for a local delivery from Paxton Polymers, a company located in Baton Rouge.
When he arrived at the TMI terminal, Mr. Fleniken used his truck lights to locate the trailer, which was parked where it had been left by another independent truck driver several hours earlier. The bulk trailer was situated on one of several parking pads that TMI had constructed near the edge of its 26-acre property. When trailers were parked on these pads, they were backed into place underneath electrical distribution lines owned and maintained by Entergy pursuant to a right-of-way Entergy had procured from Louis Vielee, who owned TMI and other businesses located on the property.
After Mr. Fleniken located the trailer, he hooked it up to his tractor and proceeded to make a pre-trip inspection, which is required by U.S. Department of Transportation (DOT) regulations and by Safeway's own procedures. Part of the inspection was to examine the tank to make sure it was clean, dry, and ready to be filled with the next customer's load. In order to make the inspection of this type of trailer, the operator had to climb a ladder located *1182 at the rear of the trailer and get on top of the trailer to look down the hatch. When he was ready to descend from the top of the trailer, Mr. Fleniken, who had been in a crouching position, stood up and began walking toward the ladder. His face contacted the electrical distribution line at approximately his nose level. The electrical current ran through his body, and he fell from the trailer to the ground.
The electrical distribution line that Mr. Fleniken contacted carried 19,900 volts. It had been erected sometime near 1980, before TMI purchased and developed the property. When TMI purchased the property, the area under the electrical distribution line was a grassy area, which was not being used. Testimony at trial indicated the line was erected at an approximate height of 28 feet. Thus, the line was "insulated by isolation," a term used in the industry to signify that an uninsulated line is placed high enough to avoid contact by persons and things. The point at which Mr. Fleniken contacted the line was found to be 18.5 feet from the ground. The trailer was between 13 and 13.5 feet, and Mr. Fleniken is over 6 feet tall. The height of the line, the condition of the poles, and the standards for maintaining the line were crucial issues addressed at trial.

STANDARD OF REVIEW
The Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extends to law and facts. LSA-Const. of 1974, art. V., § 10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Ferrell v. Fireman's Fund Ins. Co., 94-1252, pp. 3-4 (La.2/20/95), 650 So.2d 742, 745. A court of appeal may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." If the jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. However, where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989). Although great deference is to be afforded to the jury's determination, the manifest error standard of review does not mandate that the jury's factual determinations cannot ever, or hardly ever, be upset. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221.

FAULT
The 12-person jury voted unanimously that Safeway was negligent and that its negligence was a legal cause of the accident; the jury assigned 50 percent as Safeway's portion of fault. The 12-person jury also voted unanimously that TMI was negligent and strictly liable, that such fault was a legal cause of the accident, and that the remaining 50 percent fault should be assigned to TMI. As to Entergy's fault, 11 members of the jury found no negligence, but 12 members found no legal cause.[8] All of the above findings have been challenged on appeal.[9]

*1183 Entergy's fault:

The electrical distribution line that Mr. Fleniken contacted was one of three energized lines; a fourth line, a shield wire that was not energized, was above the three energized lines. Normally, the three energized lines would have been at the same height, but the west pole holding the lines had been somewhat displaced. Fredrick M. Brooks, who was called as a witness by the plaintiff, was accepted by the court as an expert in electrical engineering, electrical forensic engineering, the National Electric Safety Code, the Occupational Safety and Health Act of 1970 (OSHEA), and construction safety. Mr. Brooks was hired by Entergy to investigate the accident. He testified there was evidence of trauma to one of the poles. The fact that the pole was leaning was noticed after the accident by other witnesses who testified at trial. The two poles holding the lines were 426 feet apart, which was from 46 to 101 feet in excess of the standard for the longest span for that type of pole.[10]
Louis Vielee, owner of TMI and other businesses which were operated from the TMI property, testified the electrical distribution line was in place before TMI purchased the property in the early 1980s. When TMI purchased the property where the drop pads are located, the property was open and grassy and was not being used. Mr. Vielee had the drop pads constructed for the parking of loaded trailers. The drop pads are concrete slabs, 200 feet long, 3 feet wide, and 6 inches deep, which prevent loaded trailers from sinking into the ground. Hundreds of trucks use the TMI facility each day and pass under the power lines that cross above the property. However, when a trailer is parked with the front on the drop pad, the rear of the trailer is toward the ditch at the end of the property and under the electrical distribution line over the right-of-way. The biggest difference between the bulk trailer that Mr. Fleniken was standing on and other trailers used in TMI's business is that the driver must get on top of the bulk trailer to make the pre-trip inspection.
James R. Tucker, a lineman for Entergy, testified at trial that in 1993 Entergy had performed an inspection of its poles which included the TMI property. If there had been a hazard, such as a pole being hit or a line being too low, Entergy personnel would have documented the hazard at that time. Mr. Tucker stated he would not have reported the fact that trucks were parking under the line unless it would have appeared to him to be a hazard, such as if he had seen a man standing on a trailer. The testimony of Jeffrey Allen, a serviceman/troubleshooter for Entergy, was essentially the same as that of Mr. Tucker.
Arthur L. Maginnis, a senior claims adjuster for Entergy who had retired by the date of the trial, testified he went to the accident site and took measurements and photographs. The line was 18.5 feet from the ground two days after the accident; the difference between the contacted line and the other two lines was 3 to 4 feet, as the other two lines were over 20 feet above ground. He testified that as soon as Entergy was aware people were getting on top of the trailers in the parking lot, Entergy made adjustments to the line.
Vincent Goodman, a defense witness, was accepted by the court as an expert in electrical engineering, forensic electrical engineering, design of electrical distribution, and the National Electric Safety Code. He testified the excess difference between the two poles would allow the lines to sag and could cause problems with the guy wires staying in the ground. He verified that the right-of-way Entergy procured from TMI requires that there be no structure within 10 feet of the line. It was his opinion there should have been 10 feet between the top of the trailers and the energized line.
*1184 Duty-risk is the appropriate analysis in an action brought against an electric utility company for negligence. Lajaunie v. Central Louisiana Electric Company, Inc., 552 So.2d 746, 747 (La. App. 1 Cir.1989), writ denied, 558 So.2d 1130 (1990). In order to establish the liability of Entergy, the parties had to prove the following: (1) that Entergy owed a duty to Mr. Fleniken; (2) that Entergy breached that duty; (3) that Entergy's conduct was a cause in fact of Mr. Fleniken's injuries; (4) that Entergy's substandard conduct was a legal cause of Mr. Fleniken's injuries; and (5) that Mr. Fleniken suffered actual damages. See Fowler v. Roberts, 556 So.2d 1, 4 (La.1989), reh. granted on other grounds and original opinion reinstated as supplemented, 556 So.2d at 13 (La.1989). The first element is usually a judge question, and the other four are usually jury questions unless reasonable minds could not differ. Fowler, 556 So.2d at 4-5.
In the instant case the district court judge instructed the jury as follows concerning the duty owed by Entergy:
Now, a power company must exercise the utmost care to reduce hazards to life as far as practical in maintaining and employing high power lines. This includes the duty to inspect its wires and other equipment on a reasonable schedule to discover and correct hazards and defects. If it is reasonably anticipated that persons might come in contact with energized lines, the power company must insulate them, post adequate warning signs or take other precautions reasonable under the circumstances to prevent injury. The duty to maintain energized power lines in such a way as to reduce hazards to life includes the risk that an individual might come in contact with them. The duty is to protect that individual from that contact.
Despite the above duty, an electric utility company is not required to guard against situations which cannot reasonably be expected or contemplated. Simon v. Southwest Louisiana Electric Membership Corporation, 390 So.2d 1265, 1267 (La.1980) (workman was electrocuted when a 42-foot drilling pipe he was removing at ground level from a well hole touched an overhead power line 26.7 feet above the ground). When the accident could not have been reasonably anticipated, it is not within the scope of the duty owed by the utility company to the injured party because there is no ease of association between the risk presented by the utility company's conduct under the overall circumstances and the resulting injury. Hebert v. Gulf States Utilities Company, 426 So.2d 111, 114 (La.1983).
Throughout the trial in the instant case, emphasis was placed on the fact that the accident would not have occurred if Mr. Fleniken had not climbed on top of the trailer. However, that fact alone does not represent the entire picture of causation. It took the combination of Mr. Fleniken's standing on top of the trailer and of Entergy's allowing its line to sag to cause the accident. Activity on the top of the trailer raised the level of the risk of contact with the line from the ground up, and Entergy's failure to maintain its line brought the level of the risk of contact from a safe elevation down to a hazardous one.
The factual scenario in the instant case is similar to the situation in Hebert, 426 So.2d 111, where the energized lines were suspended 26'4" from the ground, but they were only about four feet above the head of a six-foot worker who was standing on top of an end wall rafter. In Hebert, the court explained:
[T]his accident occurred in an industrial park where the construction of metal buildings was commonplace.... The means and methods of construction on... site were customary for the industry and those usually employed by ... the plaintiff Hebert. Moreover, the risk is different for one assigned to work fifteen feet above the ground and atop a structure which is within ten or eleven feet of the power line, than for ground level workers who must use extraordinary *1185 means to contact the overhead electrical lines. Therefore the risk that an iron worker placing a twenty foot metal fascial angle on the top outside of a metal building will be injured by electrocution by inadvertently touching a power line at most only eleven diagonal feet away from his work place comes within the scope of the utility's duty to exercise the utmost care to reduce hazards to life as far as practicable. The duty of the defendant electrical utility was meant to protect this plaintiff worker from this type of harm (electrocution) arising in this manner (constructing a metal building in an industrial park).
. . . .
The lines, according to the defendant utility, were "insulated by isolation." Isolation in this sense means that the lines because of their location were not readily accessible to people. The lines were suspended 26'4" from the ground, with a horizontal and vertical clearance of 3.45' and 9.5' respectively from the nearest part of the building. These distances satisfied the minimum industry requirements when the lines were erected.... However mere compliance with safety standards does not, per se, relieve the utility of negligence.

In proper perspective, the power line was only about four feet above and three feet away from the head of a six foot worker standing, as was Hebert, on top of the end wall rafter. Furthermore these national standards are for already constructed solid wall buildings without windows facing the servitude. That margin of safety is a far cry from that needed for a building under construction. The construction of a building involves, as in this case, an ongoing work site with workers and activity above, below and around the skeleton of the building. The national clearance standards for an already completed solid wall structure without a window facing the servitude can hardly render solace to the utility in the case of an industrial accident resulting from the construction of the building itself. Additional inquiry must be made concerning the actual continuing effectiveness of the insulation. (Emphasis supplied; citations omitted.)
Hebert, 426 So.2d at 115-116.
Likewise, in the instant case, although the electrical distribution line was 18.5 feet above the ground, in proper perspective, the line was less than six feet from the top of the trailer. Although the plaintiff's expert witness, Mr. Brooks, testified the standard for electrical distribution lines above parking lots was 18.5 feet above ground, the categorization of the TMI property where the accident occurred as a parking lot failed to take into account its use as a trucking terminal. Entergy was aware of the use of the property as a trucking terminal at the time of the accident, as Entergy personnel had recently been on the property providing electrical installations at a building that was being converted into a wash-rack. Entergy personnel may not have actually seen drivers such as Mr. Fleniken get on top of the trailers parked under its line. However, the presence of the huge trailers on the property, the close proximity of the electrical lines to the top of the trailers, and the use of the property as a trucking terminal should have alerted Entergy to the fact that the TMI property was not a mere parking lot. Entergy should have anticipated the problems created by its line sagging approximately 10 feet lower at the time of the accident than when it was initially installed. In Hebert, the activity on the property was sufficient to place the accident within the scope of the utility company's duty. In the instant case, the activity on the TMI property and Entergy's failure to maintain its line at a proper height combined to cause Mr. Fleniken's accident, and such a combination clearly brings the accident within the scope of Entergy's duty.
As the court noted in Hebert, insulation by isolation is sufficient until something intervenes. "Just as time, climate, blows or other circumstances may deteriorate rubber insulation coating a wire, so *1186 insulation by isolation may deteriorate with a changing environment." Hebert, 426 So.2d at 116. In Hebert and in the instant case, the utility company could not fulfill its duty by maintaining the status quo. The protective measures which had previously been deemed sufficient to avoid work-place accidents became inadequate, in Hebert and in the instant case, because activity occurred beneath the highly energized, uninsulated electrical line. Further, in the instant case, the activity beneath the line combined with the sagging of the line. Entergy's duty was to take reasonable measures to assure that workers, legitimately in the area where it allowed parking of tall trailers under its power line, were able to work without unreasonable risk of harm.
A utility company is charged with a duty of utmost care because lines that transmit substantial amounts of electricity pose a great risk of causing substantial harm. Entergy had a duty to inspect its lines to determine that the uninsulated high voltage line did not pose a risk of harm. If Entergy relied on insulation by isolation, Entergy had a duty to make certain the lines remained isolated. Its duty to inspect was heightened in an area where there was activity, where the area was no longer isolated and no longer uninhabited. The risk is too great, the potential for damage too substantial when lines are no longer isolated because the use of the premises is altered. Because of the sag in the line and the activity beneath the line, the distance between the top of the trailer and the line was approximately six feet. Thus, insulation by isolation was no longer a reasonably safe alternative. Personnel from Entergy were regularly on the TMI premises. Given Entergy's duty of utmost care and its obligation to inspect its lines, the close proximity of the line to human activity is a breach of Entergy's duty.[11]
As indicated, there must be proof of five elements to establish liability on the part of Entergy. See Fowler, 556 So.2d at 4. Our discussion thus far focused on duty and the breach of that duty by Entergy. There can be no dispute that Entergy's conduct in failing to adequately isolate and inspect its line was a substantial factor and thus a cause in fact of Mr. Fleniken's injuries. There can be no dispute that Entergy's substandard conduct was a legal cause of Mr. Fleniken's injuries. Id. A special trip to the TMI premises for inspection of the line was unnecessary because Entergy personnel were regularly on the premises and had the obligation and opportunity to view the proximity of the line to the trailers. If the line was originally installed at 28 feet above the ground, the cost to raise the sagging line and thus to reduce the risk was probably nominal. There can be no dispute that the actions of Entergy contributed to the damages sustained by Mr. Fleniken.
Our review of the entire record reveals the jury committed manifest error in failing to find Entergy was at fault.[12]

Safeway's Fault:
The jury found Safeway was negligent and its negligence was a legal cause of the *1187 accident. The record fully supports these findings.
Safeway's initial challenge to the jury's finding of negligence is that, as a matter of law, Safeway owed no duty to Mr. Fleniken. This argument is based on the assumption that Safeway had no knowledge of the unreasonably dangerous condition of the electrical distribution line. As we note hereafter, that assumption is not borne out in the record. Safeway's duty was succinctly stated by the defense expert witness, Vincent Goodman, who verified that a distance of 10 feet between the top of the trailer and the energized line was required for a safe workplace. Thus, Safeway's argument that it owed Mr. Fleniken no duty is untenable.
On appeal, Safeway admits at least one of its employees knew about the low hanging line, but Safeway claims no responsibility stems from that knowledge because the employee did not know it was an uninsulated, energized electrical line. Our review of the record convinces us the jury could have reasonably concluded the employee, George Stewart, son of Safeway President Gregory Stewart, was unreasonable in failing to comprehend the danger of the low hanging line. Safeway admits George Stewart testified that the week prior to the accident, he had climbed on top of the trailers in the vicinity of the accident site and he noticed a low line. However, because the line was not in his way, he did not tell his father about the low line. He did not think a power line would be that low. At no time did he realize that the line was an uninsulated electrical line.
Despite the above testimony, which Safeway notes in its brief to this court, the jury heard the following testimony concerning George Stewart's knowledge of the electrical distribution line. James A. Sibley, Jr., owner of a trucking business by the name of Tomahawk Express Transportation, Inc., testified that a short time before the wash-rack was in operation he and George Stewart had observed the low-hanging line above the parking pads. Mr. Sibley said there was no doubt it was an electrical line and it worried him because he knew the bulk trailers required inspection from the top. George Stewart admitted visiting with Mr. Sibley, but stated it was a few months after the wash-rack was opened; he did not recall a conversation with Mr. Sibley about the power line. Mr. Brooks, plaintiff's expert witness, testified his investigation of the accident revealed the cause of the accident was an unsafe work site created by trailers parked underneath the power line without an adequate zone of safety clearance, and that the condition was known to Safeway at least a month before the accident, but it was not reported to Entergy. Although Mr. Goodman testified the average consumer does not know lines are not insulated, Mr. Brooks stated a survey done in some Louisiana parishes resulted in 70 percent of the people surveyed saying they would recognize that a wire on a pole would be potentially dangerous.
Additionally, the jury could have inferred from further testimony that Safeway should have known about the hazard though its president, Gregory Stewart. Andre R. York, a TMI employee who washed trailers in TMI's half of the wash-rack, had observed Gregory Stewart checking out bulk trailers in the yard for possible damage, even climbing on top of them. Michael Chad Fleniken, the plaintiff's son, and John "Frenchie" Robertson, a family friend, went to the TMI property the day of the accident; in daylight hours, the low hanging line was obvious to both of them. Mr. Sibley also testified that Gregory Stewart told him "in so many words" that the accident should not have happened because he thought the low line had been taken care of. Albert P. Magee, Safeway's safety director since 1994, testified he was familiar with the drop pads, but he never thought about the power lines one way or the other; in the two years he was there before the accident, he did not notice the power line. Gregory Stewart denied telling Mr. Sibley something should have been done before the accident; he said he meant something should have been *1188 done sooner about the line after the accident. Gregory Stewart insisted he did not know the power line existed in the low manner prior to the accident; he did not know the backs of the trailers were under the power line.
Thus, through its employee, George Stewart, Safeway had knowledge of the low hanging line; through its president, Gregory Stewart, it had constructive knowledge of the location of the line. Safeway's contention that it was unaware of and not responsible for the hazardous condition created when its trailers, which required pretrip inspections, were parked under the electrical distribution lines is without merit. Its failure to bar use of the particular parking spaces under the electrical distribution lines was a breach of the duty Safeway owed to its operator/drivers, such as Mr. Fleniken. There was no error in the jury's allocation of fault to Safeway.[13]

TMI's Fault:
The jury allocated fault to TMI after finding TMI was negligent and strictly liable. The record fully supports a finding of strict liability. TMI maintained the terminal and made use of the parking space under Entergy's electrical distribution lines. In the darkness of the early morning hours immediately preceding the accident, Mr. Fleniken encountered a latent premises defect, specifically, the low hanging electrical distribution line over the right-of-way portion of TMI's property. TMI's argument that it did not have garde of the electrical distribution line is without merit. Clearly, the record supports a finding that TMI had garde of its own property, including the parking pads and the airspace above the parking pads. In fact, TMI chose to locate the parking pads beneath the electrical distribution lines because the area affected by Entergy's right-of-way could not be used for any other type of structure. If TMI did not have actual knowledge that the electrical distribution line was in dangerous proximity to the large bulk trailers, TMI should have known. The testimony at trial proved that the hazard posed by the six-foot clearance between the electric line and the trailer was in existence for a period of time sufficient for the landowner to discover the hazard during daylight hours. Significantly, evidence at trial indicated TMI was obligated to notify Entergy about any change in the use of the property beneath the electrical distribution line, but failed to do so. The jury was not manifestly erroneous in concluding TMI was at fault for Mr. Fleniken's injuries.

Allocation of Fault:
Because the jury erred in failing to assess any fault on Entergy's part, we must make such an assessment. In apportioning fault, the court considers the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Gibson v. State, Department of Transportation and Development, 95-1418, 95-1419, p. 12 (La.App. 1 Cir. 4/4/96), 674 So.2d 996, 1005, writs denied, 96-1862 (La.10/25/96), 681 So.2d 373, 96-1895 (La.10/25/96), 681 So.2d 373, and 96-1902 (La.10/25/96), 681 So.2d 374. The factors to be considered include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacity of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985); Moore v. Safeway, Inc., 95-1552 (La.App. 1 Cir. 11/22/96), 700 So.2d 831, 853, writs denied, 97-2921 (La.2/6/98), 709 So.2d 735 and 97-3000 (La.2/6/98), 709 So.2d 744.
*1189 Considering the above factors, we find the three defendants (Safeway, TMI, and Entergy) were equally at fault. The activities of Safeway and TMI caused the work required of Mr. Fleniken to be performed within dangerous proximity to the energized line by raising the work space from ground level to over 13 feet above ground. The failure of Entergy to repair its line, which at the time of the accident sagged approximately 10 feet lower than its original height of 28 feet above ground, compromised its insulation by isolation and enabled human contact with the uninsulated line. Thus, the fault of Entergy, Safeway, and TMI converged to cause the accident.
However, when an appellate court finds a clearly wrong apportionment of fault, it should adjust the apportionment, but only to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the jury's discretion. Clement v. Frey, 95-1119, 95-1163, pp. 7-8 (La.1/16/96), 666 So.2d 607, 611; Barsavage v. State, Department of Transportation and Development, 96-0688, pp. 9-10 (La.App. 1 Cir. 12/20/96), 686 So.2d 957, 962, writs denied, 97-0595 (La.4/18/97), 692 So.2d 455 and 97-0634 (La.4/18/97), 692 So.2d 456; Lee v. State, 98-2559, p. 6 (La.App. 1 Cir. 12/28/99), 751 So.2d 321, 325. We conclude Entergy was no more than one-third at fault, but no less than 20 percent at fault. Accordingly, we increase Entergy's fault from zero to 20 percent, which is the lowest amount the jury could have reasonably allocated to Entergy.
Assessing Entergy with 20 percent of the fault leaves 80 percent of fault for the other two parties, Safeway and TMI. The jury found Safeway and TMI were equally at fault, and we cannot say that finding was manifestly erroneous.[14] Accordingly, the percentages of fault are: Entergy, 20 percent; Safeway, 40 percent; and TMI, 40 percent.

EMPLOYER'S IMMUNITY FROM TORT LIABILITY
At the trial on the merits, Safeway urged two separate theories to support its argument that it could not be held liable in tort to Mr. Fleniken. The jury was presented with interrogatories concerning the two-contract theory and answered those interrogatories in Safeway's favor. Thus, the trial court divided the damages assessed by the jury in half and refrained from rendering judgment against Safeway, based on the conclusion that Safeway was immune from tort liability pursuant to the two-contract theory. We pretermit discussion of the two-contract theory and address the alternative theory of immunity from tort liability.

Jury Finding of No Predominant Manual Labor:
On appeal, Safeway urges the jury erred in finding that Mr. Fleniken was not performing manual labor. We agree.
The jury was presented with two interrogatories concerning Mr. Fleniken's status under the Louisiana Workers' Compensation Law, LSA-R.S. 23:1021 et seq. The jury voted unanimously that Mr. Fleniken was an independent contractor at the time of his accident. On appeal, the parties have not challenged this finding. Ten persons on the jury answered that Mr. Fleniken had not "predominantly performed manual labor as an independent contractor." The interrogatories were pertinent because of the provisions of LSA-R.S. 23:1032 and 23:1021(6), and Safeway's claim to immunity in tort.
Louisiana Revised Statutes 23:1032 provides in pertinent part:
§ 1032. Exclusiveness of rights and remedies; employer's liability to prosecution under other laws.
A.(1)(a) Except for intentional acts provided for in Subsection B, the rights and remedies herein granted to an employee *1190 or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights, remedies, and claims for damages, including but not limited to punitive or exemplary damages, unless such rights, remedies, and damages are created by a statute, whether now existing or created in the future, expressly establishing same as available to such employee, his personal representatives, dependents, or relations, as against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal, for said injury, or compensable sickness or disease.
(b) This exclusive remedy is exclusive of all claims, including any claims that might arise against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal under any dual capacity theory or doctrine.
(2) For purposes of this Section, the word "principal" shall be defined as any person who undertakes to execute any work which is a part of his trade, business, or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof.
Louisiana Revised Statutes 23:1021(6) provides:
"Independent contractor" means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter.
Thus, LSA-R.S. 23:1021(6) allows workers' compensation coverage for a certain type of independent contractor, one who is engaged in manual labor for a substantial part of the work time, and LSA-R.S. 23:1032 allows tort immunity to that type of independent contractor's "employer."
In 13 H. ALSTON JOHNSON III, LOUISIANA CIVIL LAW TREATISE: WORKERS' COMPENSATION LAW AND PRACTICE [MALONE & JOHNSON] § 71 at 126 (3d ed. 1994), it is noted that the determination of the status of independent contractor has been a difficult one. Employers may label certain employees as independent contractors in order to avoid paying compensation. Id. The author opines that the 1948 amendment to LSA-R.S. 23:1021(6) was designed to address this problem by allowing certain independent contractors to receive compensation "who spent a substantial portion of the work time carrying out the contract in manual labor." Id. at 126 n. 3. Thus, it is the substance of the relationship and not the label used which determines whether an independent contractor recovers workers' compensation benefits. Teel v. Superior Scrap Metals, 95-969, p. 4 (La.App. 5 Cir. 5/15/96), 675 So.2d 1169, 1171, writ denied, 96-1566 (5/1/97), 693 So.2d 749.
In Riles v. Truitt Jones Construction, 94-1224, p. 4 (La.1/17/95), 648 So.2d 1296, 1298, the supreme court held that LSA-R.S. 23:1021(6) "creates a coverage exception for those independent contractors who spend a substantial part of their worktime in manual labor." The supreme court noted that the jurisprudence has uniformly defined "manual labor" as work where the physical element predominated over the mental element; the court endorsed the definition as the correct interpretation of the term "manual labor" in LSA-R.S. 23:1021(6). Riles, 94-1224 at 10, 648 So.2d at 1300.
In considering whether an independent contractor is entitled to coverage under the Louisiana Workers' Compensation Law, the final issue to be addressed concerns *1191 the "substantial part" requirement of LSA-R.S. 23:1021(6). This term has been liberally construed, and it is not a mathematical formulation. Riles, 94-1224 at 10, 648 So.2d at 1300. After stating that the true meaning of the term "manual labor" is to denote work in which the physical element predominates over the mental, the court in Welch v. Newport Industries, 86 So.2d 704, 706-707 (La.App. 1 Cir.1956), addressed "substantial part" in the context of LSA-R.S. 23:1021(6). In that case Judge Tate referred to the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., and the surrounding federal jurisprudence. The court held that while in some legal contexts "substantial" signifies a larger part, such as in "substantial compliance," legally the words "substantial part" also are used, not as a term of mathematical precision, but to mean the converse of insubstantial or immaterial. Welch, 86 So.2d at 706. The Welch test for "substantial part" is still the accepted criteria for determining the issue. Riles, 94-1224 at 11, 648 So.2d at 1300.
The Workers' Compensation Law Treatise points out that in the earlier cases applying LSA-R.S. 23:1021(6), the contest was whether the independent contractor could collect compensation benefits. In later cases, the distinction between independent contractor and employee has been urged in an effort to resolve the question of tort damages versus compensation, rather than the question of compensation or no compensation. See JOHNSON, § 81 at p. 172, and cases cited therein determining the "manual labor" issue in the context of a plea of immunity in tort.
In the instant case, the record is replete with evidence that Mr. Fleniken performed manual labor on a substantial and regular basis. At the trial on the merits, Mr. Fleniken described his activities on the morning of the accident; his activities were both physical in nature and typical of the activities he regularly performed in preparation for taking a trailer on the road. Although Mr. Fleniken was the owner of four tractors, he continued to operate as a driver. Indeed, the bulk of his compensation was received for his services as a driver, not for providing the tractors he owned. Mr. Fleniken, himself, described his work as "very physical" and as manual labor. Although Mr. Fleniken had paperwork to do as a driver and as an owner of the tractors, and had mental decisions to make such as whether the trailer met DOT specifications, his activities on the morning of the accident and on his previous cross-country trips for Safeway were predominantly physical in nature. Similar to the plaintiff in Welch, Mr. Fleniken was a workingman who participated in the trucking business physically himself, rather than "aloofly" directing the operation of his business "in clean Sunday clothes." Welch, 86 So.2d at 706. See also, Fontenot v. J.K. Richard Trucking, 97-220, p. 8 (La.App. 3 Cir. 6/4/97), 696 So.2d 176, 180 (injured truck driver applying for workers' compensation benefits was an employee as opposed to an independent contractor; however, even if considered an independent contractor, he performed manual labor as a truck driver); Timberlake v. Avis Rent A Car System, Inc., 361 So.2d 934, 935 (La.App. 4 Cir.1978), (plaintiff, who contracted to drive an automobile from Baton Rouge to New Orleans for a set price, was performing manual labor).
Adhering to the proper standard of appellate review, we hold the jury in the instant case unreasonably concluded Mr. Fleniken's work for Safeway did not predominately include manual labor, thus committing manifest error. Reversing that finding makes the immunity from tort liability provided in LSA-R.S. 23:1032 available to Safeway. Thus, the portion of the trial court judgment that did not order Safeway to pay damages to Mr. Fleniken in tort will be affirmed.[15]

*1192 Reallocation of Fault:

Mr. Fleniken urges the trial court erred in reducing his damages proportionately to the percentage of fault attributable to the immune tortfeasor, Safeway. Because the accident pre-dated the 1996 amendment to LSA-C.C. art. 2324, this argument has merit.
Since 1991, the Louisiana Supreme Court has rendered several opinions concerning the quantification of employer fault in third-party tort actions, pursuant to LSA-C.C.P. art. 1812(C) and LSA-C.C. art. 2324(B). In Keith v. United States Fidelity & Guaranty Company, 96-2075, pp. 3-4 (La.5/9/97), 694 So.2d 180, 181-182, the court discussed the development of the jurisprudence on this subject.
The court noted that in Guidry v. Frank Guidry Oil Company, 579 So.2d 947, 953-954 (La.1991), it had held that the workers' compensation principle made the concept of employer fault excludable in tort actions against third-party tortfeasors. Thereafter, in Gauthier v. O'Brien, 618 So.2d 825, 831 (La.1993), the court overruled Guidry and determined that LSA-C.C. art. 2324(B) mandated the quantification of employer fault. However, the court went on to hold that while employer fault must be quantified by a jury to enable the jury to reach a fairer determination of the relative fault of all blameworthy parties, the judge, after the jury had returned a verdict, should disregard the proportion of fault assessed to the employer and re-allocate the proportionate fault to all other blameworthy parties. Gauthier, 618 So.2d at 833.
Subsequently, in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496, p. 9 (La.6/30/95), 657 So.2d 975, 981, the court rejected its holding in Gauthier and reinstated its prior determination in Guidry that excluded the quantification of employer fault. Keith, 96-2075 at 3, 694 So.2d at 181.
However, in Acts 1996, 1st Ex. Sess., No. 3, Sec. 1, effective April 16, 1996, the legislature amended LSA-C.C. art. 2323 to expressly provide that the degree of fault of all persons shall be determined, regardless of the person's immunity by statute, including immunity as provided by LSA-R.S. 23:1032 of the workers' compensation law.
Additionally, LSA-C.C. art. 2324(B) was amended at the same time to provide that except as to intentional or willful acts, liability for damages caused by two or more persons shall be a joint and divisible obligation. The amended paragraph further provides that:
A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, ... regardless of such other person's ... immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032.
In Keith, the court considered the amendments to LSA-C.C. art. 2323 and held that the clear pronouncement of the legislature invalidated the holdings in Cavalier as to the quantification of fault of nonparties, and that the 1996 amendment to LSA-C.C. art. 2323 was procedural and should be applied retroactively. The court stated, "Viewing the applicability of Act 3 to the case sub judice, it is clear that the substantive right to allocate fault was created in 1979 with the introduction of comparative fault. As such, Act 3 simply delineates a method for enforcing that substantive right as particularly applied to the statutory employer." Keith, 96-2075 at 7, 694 So.2d at 183. However, in a concurring opinion, Justice Calogero noted that the issue of whether the quantification of the employer's fault can be used to reduce the amount the plaintiff can recover from other non-immune defendants (apparently pursuant to the amended version of LSA-C.C. art. 2324(B)) was "reserved for another day." Keith, Calogero concurring, 96-2075 at 1, 694 So.2d at 184.
*1193 Subsequently, in Aucoin v. State, Department of Transportation and Development, 97-1938, 97-1967, pp. 8-10 (La.4/24/98), 712 So.2d 62, 67-68, the court addressed the retroactivity of the 1996 amendments to LSA-C.C. art. 2324(B). Under facts which did not involve quantification of employer fault, the portion of Article 2324(B) at issue was the revocation of solidary liability of joint tortfeasors. In determining that the amended version of LSA-C.C. art. 2324(B) applied prospectively only, the court held that "since the amendment resulted in changing the amount of damages recoverable, the change was clearly substantive." Aucoin, 97-1938, 97-1967 at 9-10, 712 So.2d at 67. The court determined that the applicable article was that which existed at the time of the accident. Aucoin, 97-1938, 97-1967 at 10, 712 So.2d at 67.
Although Aucoin did not address quantification of employer fault under LSA-C.C. art. 2324(B), this court has agreed with other circuits that the supreme court's pronouncements in Aucoin should be applied to the issue of reduction of an employee's award by the percentage of fault of the employer. See Grayson v. R.B. Ammon and Associates, Inc., 99-2597, p. 27 (La.App. 1 Cir. 11/3/00), 778 So.2d 1; see also, Lacrouts v. Future Abrasives, Inc., 99-583, p. 10 (La.App. 5 Cir. 11/10/99), 750 So.2d 1063, 1068-1069, writ denied, 99-3484 (La.2/11/00), 754 So.2d 941; Johnson v. Rogers & Phillips, Inc., 99-0116, pp. 1-2 (La.App. 4 Cir. 7/21/99), 753 So.2d 286, 295-296 (on rehearing). Because the amended version of LSA-C.C. art. 2324(B), relating to the apportionment of liability for payment of damages, is to be given prospective effect only, when the accident at issue predates the amendments, the matter is controlled by Cavalier, the law in effect at the time of the accident. Grayson, 99-2597 at 27, 778 So.2d at 18-19; Lacrouts, 99-583 at 10, 750 So.2d at 1069; Johnson, 99-0116 at 1-2, 753 So.2d at 295-296. The ratio approach of Gauthier, the controlling law at the pertinent time, is used to reallocate the employer's fault. Johnson, 99-0116 at pp. 1-2, 753 So.2d at 296.
In Grayson, because the plaintiff was not at fault in causing the accident, the fault of the immune tortfeasor was reallocated to the sole remaining tortfeasor; this court affirmed. Grayson, 99-2597 at 28, 778 So.2d at 19. Likewise, in the instant case, Mr. Fleniken was not at fault. Applying Gauthier, we must reallocate fault to the two remaining tortfeasors: Entergy and TMI. Because Entergy's fault was half that of TMI, the appropriate ratio is one to two. Thus, fault is reallocated as follows: Entergy, 33.33 percent; TMI, 66.67 percent.

Waiver of Tort Immunity:
On appeal, Mr. Fleniken argues Safeway waived its right to claim tort immunity.[16] The issue of waiver is important, for if Safeway is not immune, Mr. Fleniken can recover 50 percent of his damages from Safeway and 50 percent of his damages from TMI, despite his settlement with Entergy. See Dennis v. The Finish Line, 99-1413, 99-1414, pp. 41-43 (La.App. 1 Cir. 12/22/00), 781 So.2d 12, 43-45.
Mr. Fleniken argues Safeway intentionally and knowingly set up its business leasing tractors from independent truckers in order to avoid having to pay workers' compensation benefits and insurance premiums. However, he has cited no authority for the proposition that such action constitutes waiver of the tort immunity provided by the Louisiana Workers' Compensation Law.
The cases cited by Mr. Fleniken do not support his contention. In Davis v. Kreutzer, 93-1498, (La.App. 4 Cir. 2/25/94), 633 So.2d 796, 801, writ denied, 94-0733 (La.5/6/94), 637 So.2d 1050, the defendant *1194 forfeited its protection of tort immunity because of a tactical litigation error, not based on a waiver. The workers' compensation law provides an exclusive remedy for the employee against the employer or the principal, yet the principal in Davis stipulated to liability in tort, making its judicial confession the law of the case. In Jones v. Vela's Garage & Rental, Inc., 97-2486, p. 7 (La.App. 4 Cir. 5/27/98), 717 So.2d 246, 250, writ denied, 98-1760 (La.10/9/98), 726 So.2d 35, the court stated the general proposition that a waiver of an employer's tort immunity, even as to a third party, requires a showing that the employer knowingly gave up this right. However, the court found no waiver based on the defendant's accepting a dray receipt on which form language was printed; the court noted the dray receipt was not even signed. In Graves v. Lou Ana Foods, Inc., 604 So.2d 150, 163-64 (La.App. 3 Cir.1992), the direct defendant sought indemnity from plaintiff's employer based on language appearing on the reverse side of a work order. The court rejected the waiver argument because the work order was unsigned and the record was devoid of any evidence that the parties had discussed the question of indemnification.
As mentioned previously, Safeway was free to contract with Mr. Fleniken as an independent contractor without foregoing tort immunity. The legislature has seen fit to extend workers' compensation coverage to certain independent contractors who perform manual labor and that extension of coverage encompasses tort immunity for the employer who contracts with the laborer. Mr. Fleniken's reliance on the terms of his contract with Safeway fails to carry his burden of showing a knowing waiver by Safeway of its tort immunity.
This assignment of error by Mr. Fleniken is without merit.

QUANTUM
Both Mr. Fleniken and Safeway, on appeal, raise the issue of the amount of general damages. Mr. Fleniken contends the jury's award of $1,200,000.00 is inadequate and Safeway contends it is excessive.
This court will not disturb the general damages award because neither appellant has shown that the jury abused its vast discretion in making the award. In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court noted:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1 Cir.), writs denied, 605 So.2d 1373, 1374 (1992). The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guaranty Ins. Co., 94-0304, p. 7 (La.App. 1 Cir. 5/5/95), 655 So.2d 431, 437. The factors to be considered in assessing quantum for pain and suffering are severity and duration. Thibodeaux v. USAA Casualty Ins. Co., 93-2238, p. 8 (La.App. 1 Cir. 11/10/94), 647 So.2d 351, 357.
In the instant case, Safeway does not challenge the severity of Mr. Fleniken's injuries, but does assert that the plaintiff exaggerated the duration of his injuries. Safeway introduced surveillance tapes of *1195 Mr. Fleniken performing various tasks as proof of the limited duration of his injuries. Apparently, the jury was not convinced by the surveillance tapes to diminish the general damages award, and neither are we. Our review of the record convinces us the severity of the injuries Mr. Fleniken received in this electrocution accident and the pain and suffering he endured during treatment and rehabilitation support the award.
However, despite Mr. Fleniken's argument, we do not find the award inadequate. Although he cites cases in which greater awards have been made, we cannot say that the jury erred in assessing the effect of the injuries on this particular plaintiff. The jury could have been impressed with the extent of Mr. Fleniken's recovery from injuries that might have been fatal to a person with less physical and mental resiliency.
Accordingly, we will not disturb the award for general damages.
Finally, Safeway asserts the jury's award of $275,000.00 for past loss of income and earning capacity was excessive, and Mr. Fleniken asserts the jury's award of $500,000.00 for future loss of income and earning capacity was inadequate. A plaintiff is required to prove special damages by a preponderance of the evidence, and the findings of the trier of fact are subject to the manifest error standard of review. Johnson v. State, Department of Public Safety and Corrections, 95-0003, p. 8 (La.App. 1 Cir. 10/6/95), 671 So.2d 454, 459, writ denied, 95-2666 (1/5/96), 667 So.2d 522.
An expert economist, G. Randolph Rice, testified on plaintiff's behalf. He calculated the present value of Mr. Fleniken's lost future wages, if he maintained his fleet of four trucks, at $2,299,975.00; if Mr. Fleniken expanded his business to six trucks, the loss would be approximately $1,000,000.00 more.
Mr. Fleniken blames the jury's rejection of his expert's calculations on an alleged trial court error in admitting the opinion testimony of Gregory Stewart, who was not an expert witness, on the probable earnings of an owner/operator such as Mr. Fleniken. Our review of the record reveals that, if we completely disregard the testimony of Mr. Stewart, there remains ample support for the jury's determination that Mr. Fleniken's loss of future earning capacity was not as great as he claimed. The defense introduced surveillance tapes, as previously mentioned. Furthermore, Mr. Fleniken himself admitted to numerous activities post-accident, which could have influenced the jury to make a significant reduction in the amounts calculated by the expert. There is no merit to Mr. Fleniken's assignments of error that he was prejudiced by the admission of Mr. Stewart's opinion testimony[17] and that the award for future loss of income and earning capacity should be increased.
Another indication that the jury reduced the amount of future loss of income and earning capacity for a reason other than the rejection of Dr. Rice's calculations is the comparatively large amount the jury awarded for past loss of income. Dr. Rice testified Mr. Fleniken's loss of income from the date of the accident until the date of the trial was $501,344.00. Although the jury did not award that amount, the award of $275,000.00 was approximately 55 percent of that award.
Thus, the record supports the award of $275,000.00 for past loss of income, and Safeway's claim that the amount is excessive is without merit. The record also supports the jury's decision that Mr. Fleniken's future loss of income and earning capacity was approximately 20 percent of the loss calculated by the expert economist. The award of $500,000.00 was neither inadequate nor excessive. It was the *1196 jury's prerogative to accept or reject all or part of the testimony of any witness, including the testimony of an expert witness. See Smith v. Goetzman, 97-0968, p. 15 (La.App. 1 Cir. 9/25/98), 720 So.2d 39, 48. We cannot say the jury was manifestly erroneous in making the awards for loss of income and earning capacity.
Mr. Fleniken's and Safeway's assignments of error challenging the amounts of the jury's awards are without merit.

CONCLUSION
Based on the foregoing and on our opinion issued this date in Fleniken v. Entergy Corporation, XXXX-XXXX, XXXX-XXXX (La. App. 1 Cir. 2/16/01), ___ So.2d ___, 2001 WL 128857, the portion of the judgment of the trial court in favor of defendants, Safeway Transportation, Inc. and Zurich American Insurance of Illinois, and against Wilburn Morris Fleniken, II, dismissing the plaintiff's suit with prejudice is affirmed.[18] The portion of the judgment of the trial court for the cross-claim in favor of Safeway Transportation, Inc. and Zurich American Insurance of Illinois and against TMI Enterprises, Inc., dismissing the cross-claim with prejudice is reversed.[19]
The remainder of the judgment is vacated.
Judgment is rendered in favor of Wilburn Morris Fleniken, II, and against TMI Enterprises, Inc. for $1,387,257.70[20] plus interest thereon from the date of judicial demand until paid. Judgment is also rendered in favor of Wilburn Morris Fleniken, II, and against Clarendon National Insurance Company and Zurich American Insurance of Illinois, each for a share of the judgment rendered against TMI Enterprises, Inc., according to the insurer's status as co-insurer or excess insurer. The issue of each insurer's share shall be determined by the trial court upon remand of this case for this limited purpose.[21]
Judgment is rendered in favor of TMI Enterprises, Inc. and against Safeway Transportation, Inc. for any damages, and interest thereon, which TMI Enterprises, Inc. or its insurer, Clarendon National Insurance Company, pays to Wilburn Morris Fleniken, II, in excess of $832,313.04[22] and interest thereon.
*1197 Costs arising in the trial court are assessed equally against Safeway Transportation, Inc. and TMI Enterprises, Inc. Each party is to bear its own costs on appeal.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART; VACATED IN PART; AND REMANDED FOR FURTHER PROCEEDINGS.
NOTES
[1] Zurich American Insurance of Illinois was identified as Zurich Insurance Company in the petition of TMI Enterprises, Inc.
[2] The jury trial involved two suits that had been consolidated in the trial court, # 427,218 c/w # 449,942.
[3] This settlement resulted in the issue of Entergy's fault being urged as a defense at the trial by TMI and Safeway.
[4] Appeals numbered 1999 CA 2915 c/w 1999 CA 2916 and 1999 CA 3023 c/w 1999 CA 3024 arose out of the same incident, but were from two judgments rendered previously in favor of Safeway and Zurich on the cross-claims. See opinion issued this date, Fleniken v. Entergy, docket number 1999 CA 3023 c/w 1999 CA 3024.
[5] TMI and Clarendon filed a motion to strike portions of this appellee's brief on the grounds that its argument that a portion of the judgment should be amended is barred by LSA-C.C.P. art. 2133. We referred the motion to the merits. Because of our decision on the merits of Mr. Fleniken's appeal, the issue of the propriety of this appellee's brief is moot.
[6] A fourth error assigned by TMI relates to its cross-claim against Safeway and Zurich, which has been addressed in another opinion issued this date. See opinion, Fleniken v. Entergy, docket number 1999 CA 3023 c/w 1999 CA 3024.
[7] In the trucking industry, a tractor is a type of truck with a driver's cab used for towing a trailer. The record reveals Mr. Fleniken owned and operated four tractors during the year preceding the accident, but one of his tractors had been wrecked immediately prior to the accident and he had not yet replaced it.
[8] Apparently, the jury was somewhat confused about these interrogatories, for it was instructed to skip the question about legal cause if it found Entergy was not negligent.
[9] The jury voted unanimously that Mr. Fleniken was not at fault and that finding has not been challenged on appeal.
[10] Mr. Brooks, the plaintiff's witness, testified the standard was 380 feet, but a defense expert witness, Vincent Goodman, testified the standard was 325 feet.
[11] The situation in the instant case is distinguishable from the situation encountered in Perkins v. Entergy Corp., 98-2081, 98-2082, 98-2083, p. 23 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 404-405, writs granted, XXXX-XXXX (La.10/27/00), 772 So.2d 111, XXXX-XXXX (La.10/27/00), 772 So.2d 112, XXXX-XXXX (La.10/27/00), 772 So.2d 112. Perkins did not involve an electrocution, and the duty imposed on the utility was to use reasonable care, as opposed to utmost care. The more heightened the duty, the broader the scope of liability. Also, there was a finding in Perkins that the negligence of the utility company was not the cause in fact and not the legal cause of the plaintiffs' injuries. Here, the duty of utmost care is the appropriate duty because Mr. Fleniken was directly injured due to the dangerous nature of electricity when he came in contact with the electrical distribution line owned and maintained by Entergy.
[12] Because we find Entergy at fault, we need not address the contentions of the parties concerning the court's ruling that Entergy had judicially admitted the standard height for the energized line was 22 feet rather than 18.5 feet.
[13] Because we find no error in the jury's finding of negligence on the part of Safeway, we need not address Mr. Fleniken's assignment of error regarding allegations of Safeway's strict liability.
[14] Thus, TMI's assignment of error that Safeway was more than 50 percent at fault is without merit.
[15] Because of our conclusion regarding the issue of manual labor, it is unnecessary for us to address the parties' various assignments of error concerning the two-contract theory and the jury interrogatories concerning the contracts. However, we note that the issue of whether an individual is an independent contractor or an employee is governed by LSA-R.S. 23:1021(6), not LSA-R.S. 23:1061. JOHNSON, § 76 at p. 8 n. 5, 2000 Pocket Part.
[16] Mr. Fleniken raised this issue in the trial court, but the trial court refused to allow the issue to go to the jury. Even if this ruling was erroneous, it was not reversible error because the claim of waiver is without merit.
[17] Further, the testimony of plaintiff's own witness, Mr. Sibley, was consistent with that of Mr. Stewart regarding the gross earnings of each truck and the percentages of profit an owner/operator would realize on each truck.
[18] Our decision herein that Safeway is immune from tort liability pursuant to the Louisiana Workers' Compensation Law requires the dismissal of Mr. Fleniken's claim against Safeway and its liability insurer, Zurich.
[19] Our decision in Fleniken v. Entergy Corporation, 1999 CA 3023 c/w 1999 CA 3024, requires that the cross-claim of TMI against Safeway demanding indemnity and the cross-claim of TMI against Zurich demanding coverage as an additional insured be reinstated.
[20] This amount represents an award of 66.67 percent of the total damages of $2,080,782.60 determined by the jury, with the reduction by 33.33 percent stemming from the settlement by plaintiff with Entergy coupled with the assignment of a percentage of the fault of Safeway to Entergy. For an explanation of how the percentages were calculated, see discussion, supra.
[21] Our decision in Fleniken v. Entergy Corporation, 1999 CA 3023 c/w 1999 CA 3024, that TMI is an additional insured under the commercial general liability insurance policy issued by Zurich to Safeway requires that Zurich be cast in judgment for a portion of plaintiff's damages. However, the parties did not address the insurance obligations of Zurich and Clarendon as insurers of TMI. In the interest of justice, we are obligated to remand this matter for a determination of the insurance obligation, based on whether one insurer is primary and the other is an excess insurer or whether their insurance obligations are coextensive.
[22] The amount of $832,313.04 represents 40 percent of the total damages. TMI was found to be 40 percent at fault and assessed 26.67 percent of the fault of Safeway. See discussion, supra. Our decision in Fleniken v. Entergy Corporation, 1999 CA 3023 c/w 1999 CA 3024, that Safeway is obligated to indemnify TMI entitles TMI to recover from Safeway if TMI pays in excess of 40 percent of Mr. Fleniken's damages. However, as a practical matter, if Zurich, as TMI's liability insurer, pays Mr. Fleniken's damages in excess of $832,313.04 plus interest, no indemnity for that amount will be due because Zurich is also Safeway's insurer for the amounts Safeway must pay as indemnitor.