RANDALL DARREN FLOWERS
v.
ENTERGY CORPORATION
No. 2008 CA 1926.
Court of Appeals of Louisiana, First Circuit.
January 29, 2010.
Not Designated for Publication
ANDREW W. RALSTON, STACEY MOAK, Counsel for Plaintiff/1st Appellant Randall Darren Flowers
KENNETH S. WOMACK, TERRY GERMANY, Counsel for Intervenor/2nd Appellant Fire and Casualty Company of Connecticut
CHARLTON B. OGDEN, III, JOHN J. ZVONEK, Counsel for Defendant/Appellee Entergy Corporation
RANDI S. ELLIS, DANIEL J. BALHOFF, Counsel for Defendant/Appellee Charter Communications, L.L.C.
MARK E. YOUNG, Counsel for Defendant/Appellee Lumbermans Mutual Casualty Company
Before: PARRO, McCLENDON, and WELCH, JJ.
McCLENDON, J.
Plaintiff, Randall Darren Flowers, and intervenor, the Fire and Casualty Company of Connecticut (FCC), appealed a judgment rendered in conformity with the jury's verdict in favor of the defendants, Entergy Louisiana, Inc. (Entergy) and Charter Communications, L.L.C. (Charter).[1] After a thorough review of the record, we cannot say that the jury manifestly erred in its verdict or that the trial court abused its discretion in its evidentiary rulings. Thus, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
On January 5, 2001, in a rural area of Springfield, Louisiana, plaintiff, Mr. Flowers, parked his truck, and an attached trailer belonging to a customer, on a driveway leading to his residence and those of other family members, including his uncle, Ellis Martin. The truck and trailer were parked near a pump house located on family property. Mr. Flowers customarily used the pump house as a source of water to wash the truck and trailer before and after hauling trips for customers. On the day of the accident, Mr. Flowers, who was five feet, six or seven inches tall, climbed on top of the trailer, which was approximately thirteen feet, four inches in height, resulting in a total height of over nineteen feet. While on top, he used a hose, bucket, and long-handled wooden brush to wash the truck and trailer. While washing the trailer, Mr. Flowers came in contact with an electric distribution or power line and was severely injured.
The hot power line, or conductor, and an accompanying neutral power line, which carried no voltage, were maintained by Entergy. The poles also carried a cable line that had been subsequently attached below the two power lines by Charter's predecessor, apparently without the utility's permission.[2] All the lines ran parallel to the driveway from its entrance at Willie Coates Lane[3] until the driveway forked in an area just past the pump house, with one fork leading to Mr. Flowers' residence and the other to Mr. Martin's house. At the fork, the lines partially crossed the driveway.
Mr. Flowers sued Entergy and Charter. The workers' compensation carrier, FCC, intervened seeking reimbursement of benefits paid to Mr. Flowers.
Prior to trial, Charter filed a motion in limine seeking to exclude testimony regarding acts it considered to be remedial measures. The trial court granted the motion and excluded the testimony.
Plaintiff also filed a motion in limine requesting that any accident reconstruction evidence from Entergy's expert, Mr. Frederick M. Brooks, be excluded. Plaintiff argued that Mr. Brooks was not qualified as an accident reconstructionist. After a hearing,[4] the trial court denied plaintiff's motion.
At trial, Mr. Flowers testified that he usually parked near the pump house, but he did not remember exactly where he parked on the day of the accident or the details of the accident. Admittedly, he knew about the power lines, but said that he never paid any attention to them. When asked about a recorded report to medical personnel that he fell and then hit the power line on the way down, he denied the report, but, when pressed, he repeated that he did not remember the details of the accident.
His uncle, Mr. Martin, testified that he found Mr. Flowers on the ground near the back of the trailer, which was parked near the pump house, the water source used to wash equipment. Mr. Martin modified his earlier deposition testimony by noting that the sketch he used to show where he found Mr. Flowers was not to scale and that the pump house and the place where Mr. Flowers fell were closer to the fork than shown on the sketch. Mr. Martin had noticed that the lines were low, but he had never experienced any trouble driving trucks under the lines.
At trial, plaintiff's expert, Mr. Robert Taylor Nethken, was qualified and accepted as an expert in electrical engineering and electrical forensic engineering, with an expertise with the National Electric Safety Code (Code). He testified that the Code was not adopted as a law in Louisiana, but was relied on by utilities for minimum safety standards including heights of lines under various conditions encountered under the lines. The purpose of the Code was to provide safe clearance heights for equipment passing underneath power lines and to ensure the safety of people who were required to work under or around the lines.
Further, Mr. Nethken testified that the power lines were placed in 1982, with the top line, the conductor, at a height of approximately twenty-eight feet, with a mid-span sag to twenty-four feet, five inches. In an earlier deposition, Mr. Nethken approximated Mr. Flowers' contact point with the conductor as being close to the pump house, in an area where the lines ran parallel to and near the driveway. Mr. Nethken measured the height of the conductor at that point to be seventeen feet, ten inches. However, he explained that he had misunderstood some information received from Mr. Martin. Although he did not know the precise location of the point of contact with the conductor, by the time of trial, Mr. Nethken believed that the accident probably occurred fifteen or more feet closer to the fork than his original estimate. Also, the new position was closer to mid-span, which was the lowest point on the line and the measurement at mid-span was sixteen feet, eight inches. However, in Mr. Nethken's opinion, the accident could be reconstructed based on the available information.
Mr. Nethken also opined that the Code required the entire line between poles to be no lower than the lowest point allowed for a particular category. Mr. Nethken testified that the controlling section of the 1997 Code, which was applicable to the accident, was section 232-1, category three for driveways. Under that section, eighteen and one-half feet was the minimum height allowed. Thus, the measurement at mid-span of less than seventeen feet did not meet the Code requirements. It was Mr. Nethken's theory that, while the power lines had originally been set at a height that met the Code, the later attachment of the heavier cable line caused the poles to lean in, thereby lowering all of the lines between the two poles, especially at mid-span, which was the lowest point. In his opinion, Entergy should have noticed that the lines were too low and should have added guy lines and an intermediate pole for support.
Although the Code did not recommend or require any particular schedule for inspections, Mr. Nethken considered once every two years to be prudent. However, he believed that if Entergy had performed better inspections, it would sooner have discovered the lines were too low. Thus, he concluded that defendants breached their duty by causing or allowing the lines to be too low.
On cross-examination, Mr. Nethken admitted that the Code did not contemplate clearances for men washing a truck or trailer, while standing on top a trailer either under or near power lines. He also agreed that Mr. Flowers had a duty to himself and it was dangerous for Mr. Flowers to wash the truck or trailer so close to the power line.
At trial, the voir dire of Entergy's expert engineer, Mr. Frederick Brooks, revealed Mr. Brooks' credentials and qualifications, including his expertise in accident reconstruction, the area of dispute in plaintiff's motion in limine and at trial. Mr. Brooks testified that he had conducted close to a thousand investigations into accidents where people or equipment had contacted power lines. The investigations were conducted in half a dozen states and the majority included accident reconstruction work. Mr. Brooks explained that a reconstruction analysis involved applying engineering and scientific principles to the facts and circumstances of the case. Mr. Brooks also testified that he was a member of the committee that writes the Code. He stated that he had taught seminars on how to investigate an accident and on how to use the Code. Further, Mr. Brooks had qualified in other courts as an expert in engineering, engineering safety, the Code, and accident reconstruction.
After voir dire, Mr. Brooks was tendered as an expert in electrical engineering, Code interpretations, and accident reconstruction. The trial court accepted Mr. Brooks as an expert in the fields in which he was tendered.
Mr. Brooks agreed with Mr. Nethken that a two year inspection was appropriate. In Mr. Brooks' opinion, Entergy's inspections were acceptable.
Based on information received from Mr. Martin and Mr. Flowers, Mr. Brooks located the place where the trailer was most likely parked and measured the height of the power line at the same point of contact between Mr. Flowers and the conductor originally chosen by Mr. Nethken. However, Mr. Brooks obtained a measurement of seventeen feet, five and one-half inches, rather than the higher seventeen feet, ten inches testified to by Mr. Nethken in his deposition and in various filings by plaintiff before trial.
Mr. Brooks testified that the Code helped in maintaining "insulation by isolation." In areas where it was reasonably anticipated that either truck traffic would be driving under power lines or people were required to be working under or near lines, the workers or truckers were insulated by the area of isolation created by the height of the line.
Based on Mr. Brooks' understanding of the Code, which was echoed by an Entergy employee, the nature of the ground below a section of the line determined which category of clearance heights was applicable. Mr. Brooks referred to the same section or table used by Mr. Nethken, section 232-1, but explained that the different categories along the side of each column identified the nature of the surface below the lines. Specifically, the caption for the categories, which ran along the side of the table, read "Nature of surface underneath wires, conductors, or cables." The categories also contemplated certain types of activities that could be expected or anticipated based on the nature of the ground. The columns, which ran along the top of the table, were divided into various types of wires and specified whether the wires were insulated or non-insulated.
Mr. Brooks believed that the category for a road in a rural district where it was not likely that truck traffic would be anticipated by Entergy was more appropriate for the area of the accident than the category allowing for the crossing of a driveway by reasonably expected truck traffic. Mr. Brooks explained his choice of category, as follows:
The considerations were observation] of the physical conditions that exist and at this particular location [which were] trees, brush, and a fence line. I take that is sufficient to utilize category 10 . . ., and we're talking about a specific area. I'm not talking about the front of the property or the back of the property. But in this area[,] where he was parked and working, it's unlikely that vehicles would be crossing, crossing under the line. Crossing is a word too that has a meaning. It means crossing, not necessarily pulled parallel under the lines, but actually it contemplates like a tractor coming out of a field and crossing under the line to get on a road where no driveway exists, that's a good example.
...
The safety clearance that is specified . . . contemplates a certain activity. So if you're going over a roadway or a driveway where there's truck traffic, the clearance would be higher because the activity contemplated is of a larger vertical dimension. If you're in an area where . . . only a pedestrian could walk or a pickup truck or a car, a vehicle under eight feet high, that's the activity that's contemplated, the clearance can be lower. ... If you're crossing a railroad track, the clearance has to be higher. You look at the activity in the area of inquiry of where you're interested in and you apply the code for that activity that occurs in that area and the nature of the land in that area.
Mr. Brooks noted that the Code does not have a category for everything, thus one must apply what is reasonably closest to the circumstances. Category three was for lines crossing over a road or driveway, but the Code had no specific category for lines running parallel to a driveway in a rural district. Based on his analysis of the activity that would be reasonably expected in the residential, rural area of the accident, with rural being defined in the Code as all places not urban, Mr. Brooks believed that category 10, not category 3 chosen by Mr. Nethken, was the best fit. Category 10 was for roads not heavily traveled in a rural district. The minimum height for the conductor under the Code for a category 10 setting would be sixteen and one-half feet.
Mr. Brooks disagreed with Mr. Nethken's interpretation of the Code and how it was to be applied. In Mr. Brooks' opinion, Mr. Nethken's consideration of the spacing between the various lines, which was meant for the safety of men working on the lines, and measurements only at the lowest point of the line, rather than in the area of the accident, was the wrong analysis. Mr. Brooks testified that under the Code, lines had multiple clearance requirements based on the nature of the underlying surface. For example, a line crossing over a road has one clearance, but further up on the same line that crosses a soybean field, the requisite clearance would be lower. In Mr. Brooks' opinion, the conductor in the area of the accident did not violate the Code, and it was Mr. Flowers who had breached the insulation by isolation heights applicable to the area where he fell. From his visit to the area and pictures taken after the accident, Mr. Brooks found the area of the accident was bordered by brush and a fence that kept vehicles or trucks on the driveway and made it impossible to pass under the line running along the driveway near the pump house.
In reconstructing the accident, Mr. Brooks visited the scene of the accident and testified that he spoke to Mr. Flowers and made a rough sketch based on that conversation. According to Mr. Brooks, Mr. Flowers said that he was parked near the pump so that he could use the water hose. Mr. Flowers also said that he was on the back of the trailer at the time of the accident. After speaking with Mr. Martin, who witnessed the accident, and taking measurements, Mr. Brooks refined the positioning of the trailer extrapolated from his original rough sketch. Based on his application of science and engineering principles to the information received from Mr. Flowers, Mr. Martin, and the post-accident statements by Mr. Flowers made to medical personnel about the fall, Mr. Brooks opined that the trailer was parked on the hard surface of the driveway about three feet from the power lines, that Mr. Flowers fell off of the trailer, and that, as he was falling, contacted the conductor. Thus, even if defendants were found liable, they were liable only for the injuries caused by the contact with the energized power line, and not for the more serious injuries resulting from or connected to the fall to the ground.
Representatives of Entergy testified that Entergy did not expect the lines to stay at the initial placement heights, and its intention was to follow the Code's suggestions for clearances. As to inspections, Entergy expected its repairmen and meter readers to observe the lines and call in violations or problems whenever they were out in the field. The line riders who monitor for signal leakage on an annual basis are also expected to observe the lines. Those inspections coupled with customer reports comprised Entergy's inspection system, which it believed met the standards.
With a vote of 10 to 2, the jury answered "NO" to the following question on the jury verdict form as to both defendants: "Do you find that there was fault on the part of the defendant, . . ., which was a legal cause of the injuries suffered by the plaintiff, Randall Darren Flowers . . . .?"
In conformance with the jury verdict, the trial court entered a judgment dismissing plaintiff's suit and the intervention of FCC. Plaintiff and FCC appealed.
On appeal, the plaintiff assigns the following errors:
1. The jury erred in applying the doctrine of assumption of risk in finding that simple negligence by Mr. Flowers barred his recovery.
2. The jury committed manifest error in failing to find that defendants' non-compliance with Entergy standards and the Code was a cause-in-fact of the accident.
3. The trial court abused its discretion in allowing Mr. Brooks to testify based on his accident reconstruction.
4. The trial court erred in prohibiting plaintiff from presenting evidence on the resagging of the line post-accident.
The intervenor, FCC, assigns the same errors and makes essentially the same arguments as plaintiff.
Specifically, on the issue of the post-accident actions and expert testimony, plaintiff argues that these erroneous evidentiary rulings by the trial court tainted the jury's verdict and the appeal must be conducted de novo. On the issue of liability, plaintiff argues that defendants did not take the necessary steps to insure that the conductor remained at its original height or at the minimum safe height required by the Code of eighteen and one-half feet. If the conductor had been at the requisite height, Mr. Flowers would not have contacted the conductor and been severely injured. Thus, the defendants breached their duty of protection, which included a duty to protect people working on top of trucks, defendants' negligence were a cause-in-fact and legal cause of the fall and injuries, and defendants are liable for all damages. And finally, Mr. Flowers argues that his simple negligence did not bar his recovery.
Defendants argue that the jury was not clearly wrong because the record supports a finding that the lines met the minimum standards, thus no breach occurred, and that acts or failure to act by defendants were not the legal cause of the accident or injuries. Defendants also assert that the record contains no basis to believe that the jury considered or found an assumption of the risk by the plaintiff as the reason for its findings and that the trial court was correct in its ruling excluding testimony concerning a subsequent remedial measure and its ruling allowing Mr. Brooks to testify as an accident reconstructionist. Thus, the judgment should be affirmed.

PRETRIAL EVIDENTIARY MOTIONS

GRANT OF MOTION TO EXCLUDE POST ACCIDENT REMEDIAL MEASURES
Evidence of measures taken after an event, which would have made the event less likely to have happened, is not admissible to prove negligence or culpability. However, subsequent measures can be used for another purpose. LSA-C.E. art. 407. The trial court is granted broad discretion in such evidentiary rulings, and its determinations will not be disturbed absent a clear abuse of that discretion. Rideau v. State Farm Mutual Automobile Insurance Company, XXXX-XXXX, p. 6 (La.App. 1 Cir. 8/29/07), 970 So.2d 564, 572, writ denied. 2007-2228 (La. 1/11/08), 972 So.2d 1168. When the trial court rules that the testimony is inadmissible, a proffer can be made. LSA-C.C.P. art. 1636. So that the argument can be properly assessed on appeal, it is incumbent upon the party who asserts the error to make a proffer. If he fails to do so, he cannot contend that the evidentiary exclusion was error. Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329, 340 (La.App. 1 Cir. 1984), writ denied, 467 So.2d 531 (La. 1985); see Our Lady of the Lake Regional Medical Center v. Helms, 98-1931, p. 11 (La.App. 1 Cir. 9/24/99), 754 So.2d 1049, 1056, writ denied, 99-3057 (La. 1/7/00), 752 So.2d 863.
At trial, plaintiff proffered the following testimony from Mr. Brooks on the specific issue of the post-accident raising, apparently called resagging, of the lines:
Q. And my question to you is, after the lines were resagged to twenty-four and a half feet or thereabouts, didn't it later sag from that height, I'm talking about the conductor, sag to twenty-two feet, six inches by June 2007?
A. I don't know. I never went back out.
Plaintiff argues that the resagging of the lines, without the support offered by the addition of guy lines and placement of an intermediate pole, caused the lines to sag again. Because the raising of the lines did not solve the problem, it was not a repair and did not qualify as a remedial measure. In addition, according to plaintiff, the testimony was not meant as proof of a remedial measure, but as an impeachment of Entergy's testimony on its intended actions if it had known about the amount of sag. The proffered testimony was also to be used to show that the rate of sag was so slow that Mr. Flowers and Mr. Martin were lulled into a false sense of security about the height of the lines.
After reviewing the limited proffered testimony, and based on this record, we cannot say that the trial court abused its discretion by disallowing the evidence or that the absence of the proffered evidence prejudiced the presentation of the plaintiff's case or interdicted the jury's decision process.

DENIAL OF MOTION TO DISALLOW QUALIFICATION OF EXPERT AS ACCIDENT RECONSTRUCTIONIST
Plaintiff, Mr. Flowers, essentially argues that Mr. Brooks was not qualified to testify as an accident reconstructionist. We disagree.
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." LSA-C.E. art. 702. Ultimately, the trial judge's decision to admit or exclude expert testimony is subject to the abuse of discretion standard of review. Bethley v. Keller Construction, XXXX-XXXX, p. 7 (La.App. 1 Cir. 12/20/02), 836 So.2d 397, 403, writ denied, XXXX-XXXX (La. 4/21/03), 841 So.2d 792.
The record before us does not contain the transcript of the hearing held on plaintiff's motion in limine. However, based on the qualifications and experience related during the voir dire at trial, the trial court could have reasonably found that Mr. Brooks' testimony would be of use to the factfinder and admissible based on the witness's experience, skill, and training. For these reasons, we find no error in the trial court's denial of plaintiff's motion to disallow Mr. Brooks as an expert in accident reconstruction.
As an aside, we note that Mr. Brooks' reconstruction speaks to the timing of the contact with the power lines in relation to the fall. If Entergy had been found liable, the sequence of the fall and the contact may have determined whether Entergy was responsible for all the injuries, or just those from the electrical shock and not the fall. However, the sequence had no real bearing on the issue of liability. Having found that Mr. Flowers failed in his burden to show error in the jury's verdict on legal cause, the accident reconstruction testimony, even if erroneously admitted, has been rendered moot.

APPLICABLE LEGAL PRECEPTS ON ISSUE OF LIABILITY

STANDARD OF REVIEW
The correct standard of review by the appellate court for findings of fact is manifest error. In other words,
a trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Ferrell v. Fireman's Fund Insurance Co., 94-1252, pp. 3-4 (La. 2/20/95), 650 So.2d 742, 745. Under this rule, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Department of Transportation & Development, 617 So.2d 880, 882 (La. 1993). If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Id. at 882-883.
When the findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings of fact, for only the fact finder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, a reviewing court may well find manifest error even in a finding purportedly based upon a credibility determination. Id. Where such factors are not present, however, and a fact finder's determination is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. The rule that questions of credibility are for the trier of fact applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Lasyone v. Kansas City Southern Railroad, 00-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693.
Foley v. Entergy Louisiana, Inc., XXXX-XXXX, pp. 9-10 (La. 11/29/06), 946 So.2d 144, 153.

LIABILITY IN POWER LINE ACCIDENTS
In Foley, the Louisiana Supreme Court utilized the following analytical process for cases involving overhead power lines:
In cases of injury occurring as a result of contact with overhead power lines, principles of negligence, rather than absolute or strict liability, apply, and we assess the liability of the various parties to the accident under a duty-risk analysis. Hebert v. Gulf States Utilities Company, 426 So.2d 111, 114 (La.1983); Kent v. Gulf States Utilities Company, 418 So.2d 493 (La. 1982). To establish the liability of an electric utility company using the duty-risk analysis, the plaintiff has the burden of proving: (1) that the defendant power company owed a duty to the plaintiff; (2) that the power company breached that duty; (3) that the power company's conduct was a cause-in-fact of the plaintiffs injuries; (4) that the power company's substandard conduct was a legal cause of plaintiffs injuries; and (5) that the plaintiff suffered actual damages. Perkins v. Entergy Corporation, 00-1372, 00-1387, 00-1440, p. 7 (La.3/23/01), 782 So.2d 606, 611; Fowler v. Roberts, 556 So.2d 1, 4 (La. 1989) on reh'g, 556 So.2d at 13 (La. 1990); Fleniken v. Entergy Corporation, 00-1824 (La.App. 1 Cir. 2/16/01), 780 So.2d 1175, 1184, writ[s] denied, 01-1268, 01-1305, 01-1317 (La.6/15/01), 793 So.2d 1250, 1253, 1254.
In Simon v. Southwest Louisiana Electric Membership Corporation, 390 So.2d 1265, 1267 (La. 1980), we summarized the duty of an electric utility company in cases involving injury sustained through contact with high voltage lines. Given the inherently dangerous nature of electricity, we held that electric companies that use and maintain high voltage power lines are required to exercise the utmost care to reduce hazards to life as far as is practicable. Id. If it should be reasonably anticipated that persons may come into contact with electric lines, the owner and/or operator of those lines is required to insulate them, or to give adequate warning of the danger, or to take other proper and reasonable precautions to prevent injury. Id. However, an electric company is not under a duty to safeguard against occurrences that cannot be reasonably expected or contemplated: "[O]perators of power lines are not required to anticipate every possible accident which may occur and are not the insurers of safety of persons moving around power lines in the course of everyday living." Simon, 390 So.2d at 1268. When an accident or occurrence could not have been reasonably anticipated, it is not within the scope of the duty owed by the electric company to the injured party because there is no ease of association between the risk presented by the electric company's conduct under the overall circumstances and the resulting injury. Hebert, 426 So.2d at 114.
Nevertheless, an electric company is held to the standard of a reasonable person with superior attributes, and is required to recognize that there will be a certain amount of negligence that must be anticipated. See Levi v. Southwest Louisiana Electric Membership Cooperative (SLEMCO), 542 So.2d 1081, 1084-1086 (La. 1989); Pillow v. Entergy Corporation, 36,384, p. 5 (La.App. 2 Cir. 9/18/02), 828 So.2d 83, 87, writ denied, 02-2575 (La. 12/13/02), 831 So.2d 987. Pursuant to this duty, an electric company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects. Levi, 542 So.2d at 1084. This duty includes the obligation to inspect its lines to determine if uninsulated high voltage lines pose a risk of harm, and if the utility relies on insulation by isolation, it has a duty to make certain its lines remain isolated. Hebert, 426 So.2d at 116; Fleniken, 00-1824 at 13, 780 So.2d at 1186.
XXXX-XXXX at pp. 11-12, 946 So.2d at 154-55.
However, in the case of a dangerous condition that was apparent and obvious, the facts may demonstrate that the condition was not unreasonably dangerous in a legal sense. Pitre v. Louisiana Tech University, 95-1466, 95-1487, p. 9 (La. 5/10/96), 673 So.2d 585, 590, cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996); Hayes v. Entergy Corporation, 37,190, p. 4 (La.App. 2 Cir. 6/25/03), 850 So.2d 916, 920.
The question of whether a duty exists is a legal one, but the manifest error rule usually applies to the other four issues, including the issue of whether a defendant has breached a duty or whether the breach was the legal cause of the injuries, unless reasonable minds could not differ. Fleniken v. Entergy Corporation, XXXX-XXXX, XXXX-XXXX, p. 10 (La.App. 1 Cir. 2/16/01), 780 So.2d 1175, 1184, writs denied, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La. 6/15/01), 793 So.2d 1250, 1253, 1254, citing Fowler, 556 So.2d at 4-5; see also Perkins v. Entergy Corporation, 98-2081, 98-2082, 98-2083, pp. 34-35 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 412-13 (rehearing granted on other grounds), affirmed, XXXX-XXXX, XXXX-XXXX, XXXX-XXXX (La. 3/23/01), 782 So.2d 606 (In the first circuit opinion in Perkins, this court, after recognizing the uncertainty over the correct standard of review applicable to the question of legal or proximate cause, specifically pretermitted the issue. Perkins, 98-2081, 98-2082, 98-2083 at pp. 30-31, 756 So.2d at 410. However, in the subsequent case of Fleniken, XXXX-XXXX, XXXX-XXXX at p. 10, 780 So.2d at 1184, the author of Perkins, Judge Weimer, now Justice Weimer, adopted the rule that, for fact intensive cases, legal cause is usually a factual inquiry. A reading of the analysis by Justice Weimer in Foley, XXXX-XXXX at pp. 10, 25, 27, 946 So.2d at 153, 161, 163, lends support to that position.)

ANALYSIS
Initially, we note that this case is factually distinguishable from Foley, Fleniken, and Weaver v. Valley Electric Membership Corp., 615 So.2d 1375 (La.App. 2 Cir. 1993), which were cited by the plaintiff, Mr. Flowers. While we agree that the duty at issue has been extended to workers on top of houses or trucks, location alone is not sufficient to satisfy a finding of liability. See Fleniken, XXXX-XXXX, XXXX-XXXX at p. 11, 780 So.2d at 1184. Significantly, Foley involved a roofer repairing an apartment house roof over which electric transmission lines crossed and where another similar accident had occurred some years prior. Foley, XXXX-XXXX at pp. 1-2, 14, 946 So.2d at 148-49, 155. In Fleniken, a trucker was injured, while standing on top of a trailer, when he came in contact with a power line located above a commercial trucking terminal's parking pads. The trucker had been conducting a required inspection before leaving the pad and the electrical utility was found to have prior knowledge of the particular circumstances that gave rise to the subsequent contact. Fleniken, XXXX-XXXX, XXXX-XXXX at pp. 5-6, 12, 780 So.2d at 1181-82, 1185. In the Weaver case, a cotton picker machine used on a 700 acre cotton plantation got tangled in low power lines. The electric utility had escorted the picker to the plantation and had in the past helped the farmers move farm equipment around and under lines traversing various farms, including the cotton plantation. The worker was injured when he attempted to disengage a power line that had become entangled with the cotton picker as it passed under the lines. Weaver, 615 So.2d at 1379-80. Thus, we find Foley, Fleniken, and Weaver to be distinguishable.
In the instant case, Mr. Flowers was not parked in a required area at a commercial trucking facility, where a flow of truck traffic was reasonably foreseeable, was not required by the nature or location of the job to work under a power line, and was not trying to loosen a line that had become entangled with a farm vehicle engaged in working the fields under transmission lines. Rather, Mr. Flowers chose to wash his truck atop the attached thirteen foot, four inch trailer, near a power line running along the driveway to his residence, which was located on a large section of family property in a rural area. Although the exact position of the trailer was contested at trial, all parties seemed to agree that the trailer was parked near the pump house, either near the conductor or almost underneath, depending on which expert was believed as to location.
Nevertheless, notwithstanding the factual differences and similarities in the cases discussed above with this case, the defendants here were responsible for their lines and certainly owed a duty or standard of utmost care to Mr. Flowers. However, the existence of a duty, even one of utmost care, and assuming a finding of cause-in-fact, do not provide a final resolution to the question of liability. To establish liability, all the required elements of negligence must be found.
Of course, after hearing the conflicting testimony on the position of the trailer on the driveway, and the conflicting expert testimony on what category of the Code applied and what constituted safe clearances along the driveway in question, the jury was confronted with a choice. On the issue of safe and appropriate heights, the jury may have accepted the testimony of defendants' expert over plaintiff's. Although initial compliance with Code safety standards does not per se relieve a utility of negligence, the jury may have found that the construction standards were not the applicable safety standards, that the heights of the lines met minimum safety standards, that spacing between the conductor and the other lines was not relevant, and that the duty owed was not breached. See Foley, XXXX-XXXX at p. 18, 946 So.2d at 158. Despite the duty owed to Mr. Flowers, he maintained the burden of proof at trial and, if the jury found no breach, he failed in his burden to prove one of the necessary elements.
On the other hand, the jury may have accepted the plaintiff's theory and version of the accident, and found that the defendants did breach a duty to plaintiff. However, plaintiff must also have proved that defendants' breach of duty or substandard conduct was the legal cause of the injuries. In this case, based on the specific wording in the jury verdict, we do know that the jury found that defendants were not the "legal cause" of the injuries, which negated a finding of liability for defendants. Our duty then is to review the entire record to determine whether the jury had a reasonable basis for that finding and that the finding was not clearly wrong. See Stobart v. State through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La. 1993).
Substandard conduct or breach of a duty simply does not encompass all risk within its ambit or render the actor liable for all consequential harm "until the end of time." Perkins, 98-2081, 98-2082, 98-2083 at p. 30 n.44, 756 So.2d at 409 n.44. A finding of legal cause requires more than an act of negligence, and can be analyzed on the basis of foreseeability and ease of association between the duty involved and the risk. The extent or scope of the protection is evaluated on a case by case basis to avoid making the defendant an insurer of all persons coming in contact with defendant or defendant's business. Perkins, 98-2081, 98-2082, 98-2083 at p. 31, 756 So.2d at 410. Thus, a finding in favor of the defendants on the issue of legal cause required the jury to have found that, under the particular facts here, the risk was not known or reasonably anticipated or foreseeable by Entergy or Charter, or, assuming the breach of the duty, no ease of association fell upon the breach and the damage. Given those findings, the risk would not fall within the scope of the duty of care or protection.
As previously noted, this is not a case where a low power line came in contact with a truck or vehicle whose use was reasonably expected in the area, or a scene where a utility should reasonably expect periodic repair or work on a roof or building located under or near power lines. In this case, the record reasonably supports a finding that, even if the defendants were aware that trucks were kept on the family property, Entergy or Charter did not know nor should they have known that Mr. Flowers and Mr. Martin got on top of trucks and trailers and washed them either under or within a few feet of an adjacent power lines running parallel to or over their driveway. There is no evidence that the spot chosen by Mr. Flowers, regardless of which contact location is accepted, was the only spot suitable for washing the truck or that Mr. Flowers had no choice in the location.
Unlike the worker in Weaver, who did what he could to ameliorate the danger encountered when he was tasked with disentangling his farm machine from the power line crossing the cotton field, Mr. Flowers failed to exhibit reasonable care for his own safety by admittedly paying no attention to the nearby power line and choosing that exact location in close proximity to the conductor to wash the tractor and trailer. See Pitre, 95-1466, 95-1487 at p. 16, 673 So.2d at 593. Another location on the property, such as the other side of the driveway where no power lines were located, or the use of a hose three or more feet longer would have obviously been safer and would have eliminated the risk of a man on top of the trailer coming in contact with the power line, either directly or after falling. See Hayes, 37,190 at p. 8, 850 So.2d at 921-22.
On the issue of assumption of risk, we disagree with the plaintiff's argument that the jury's rejection of defendants' liability, and assessment of 100% of the fault to plaintiff, required the use of the discarded principle of assumption of the risk. We find no basis or reason in this record to believe that the jury employed such a principle. In contrast, the record sufficiently supports the jury's failure to assess comparative negligence, a concept explained by the trial court in the jury instructions.
From our review, the record provided the jury a reasonable basis for finding that Entergy or Charter could not have reasonably foreseen or anticipated plaintiff's choice of location for his chosen activity. Even if the duty or standard of care was breached by the height of the power line, the risk that materialized is not easily associated the breach. Plaintiff's choices, in the absence of any requirement other than the plaintiff's convenience, may simply have been too attenuated and removed from the purpose or scope of the duty for the jury to find the defendants at fault for the particular accident, under the particular circumstances present.[5] Thus, the risk was not contemplated by or within the scope of the breached duty, and therefore, not the legal cause of the injury. Given the evidence presented at trial, even if we may have found differently, we cannot say that such a finding was clearly wrong or unsupported by the record. Accordingly, we find no error in the jury verdict in favor of the defendants or the judgment dismissing plaintiff's suit and FCC's intervention.
For these reasons, we affirm the judgment. The costs of appeal are assessed equally to Mr. Randall Flowers and Fire and Casualty Company of Connecticut.
AFFIRMED.
NOTES
[1] For purposes of this appeal, defendants, who appear in the record under various names, are initially identified as Entergy Louisiana, Inc. and Charter Communications, L.L.C.
[2] From a pole on Willie Coates Lane near the driveway to the last pole on the driveway, the lines ran a distance of approximately three hundred fifty-five feet.
[3] Willie Coates Lane was a short dead-end road about one quarter of a mile long.
[4] A transcript of the hearing is not contained in the record on appeal.
[5] The jury may even have compared the total height of Mr. Flowers and the trailer at over nineteen feet and realized that he would have still been above a conductor placed at Mr. Nethken's minimum safety height of eighteen and one-half feet.